Filed 9/1/15  P. v. Rigmaden CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071533 |
| Plaintiff and Respondent, | (Super. Ct. No. SF116112A) |
| v. | |
| KUNTA SHAQUILLE ALI RIGMADEN, | |
| Defendant and Appellant. | |

At the age of 16, defendant Kunta Shaquille Ali Rigmaden entered the home of an 87-year-old widow and sexually assaulted her.  He stole jewelry and other items before leaving.  Defendant's cousins pawned some of the jewelry.  A few days later, defendant kicked in the door of a friend's home and stole electronics and video games, leaving in the homeowner's truck.  Defendant's cousins found him as he was hiding the stolen items and chased him.  His father and cousins forcibly brought defendant to the police station where he confessed.

1

A jury found defendant guilty of rape (Pen. Code, § 261, (a)(2))[1] during the commission of a burglary (§ 667.61, subd. (e)(2)) and against a victim 65 years of age or older (§ 667.9, subd. (a)), first degree burglary (§ 459) against a victim 65 years of age or older (§ 667.9, subd. (a)), elder abuse (§ 368, subd. (b)(1)), and a second count of first degree burglary. The trial court sentenced him to 20 years to life in state prison.

On appeal, defendant contends it was error to admit his statements to the police because he was not properly advised of his *Miranda*[2] rights and did not waive them, and his statements were not voluntary. He further contends it was error to instruct the jury that the trial court had found his statements voluntary, to admit testimony that his cousin offered to take a polygraph test and to restrict argument relating to that cousin's testimony, and to fail to instruct on attempted rape. Finally, he contends that his sentence violates the constitutional prohibition against cruel and unusual punishment and that a new sentencing hearing is required.

We reject defendant's contentions. We find he was properly advised of and waived his *Miranda* rights, and his statements were voluntary. Any errors in instructing the jury his statements were voluntary, admitting evidence that his cousin offered to take a polygraph test, and restricting argument were harmless. There was no evidence to support instructing on attempted rape and his sentence was not cruel or unusual. Accordingly, we shall affirm.

## FACTS

*Burglary and Assault on B.R.*

On October 9, 2010, B.R., an 87-year-old widow, lived in a cottage at a retirement community. After dinner that night, she fell asleep reading a book in the living room

---

[1] Further undesignated statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

2

with the television on.  When she awoke, defendant was standing in front of her with a towel over his face, asking for money.  She said she had none and he insisted she get up.  As she struggled to get up, defendant hit her three or four times.  She fell and broke the glass on the coffee table.

Defendant pushed her towards the bedroom.  She told him, " 'God loves you.  I see something good in you.  I'll pray for you.' "  Defendant took her clothes off, pushed her to the bed, and raped her.  She screamed that God loved him and she had never had sex with anyone but her husbands.[3]  Defendant continued to sexually assault B.R., putting his penis in her rectum.[4]  She screamed and defendant put a towel over her face.

B.R.'s earring was missing and defendant helped her find it.  He also got her ice for her black eye.  Then he left and B.R. called 911.

B.R. could not identify defendant as her assailant at defendant's first trial.  The jury in the first trial failed to reach verdicts on any counts.  At the second trial, B.R. described her assailant as a Black man with short hair, five foot nine inches tall.[5]  B.R. explained she was now able to identify defendant because her "subconscious mind" was able to see what she had seen that night; what changed from the first trial was her "subconscious mind."

B.R. was taken to the hospital.  She had bruising over her eye, and her jaw and cheek were swollen.  She was distraught and in pain.  Her son took her to the Child

---

[3]  B.R. had been a pastor's wife for 55 years.  Her first husband passed away in 2002 or 2003.  Her second husband passed away in August 2010.

[4]  The jury failed to reach a verdict on the sodomy charge.  (§ 286, subd. (c)(2).)  Defendant told the police the sodomy was an "accident."

[5]  She had previously described her assailant as weighing 160 pounds with long hair.  Defendant's family described him to the police as weighing about 200 pounds.  The video of his statement to police shows he is considerably heavier than 160 pounds, and he is described by one witness as "heavyset."

Advocacy Center for a sexual assault examination.  Neither the vaginal nor rectal exam revealed any trauma, tears, or bleeding.  No semen or dried secretions were found.

When B.R. returned from the hospital, she noticed that several pieces of jewelry were missing.  Among the missing jewelry were her wedding and engagement rings that she had taken off and put on the table by the chair before the attack.  Brandon Clinton and Oscar Leon, defendant's cousins, pawned some of B.R.'s jewelry.  The police found the jewelry at Annette's Pawn Shop and B.R. identified it.

*Burglary at Hernandez/Macato Residence*

Joseph Hernandez and Jennifer Macato lived on Cortez Avenue in Stockton. Defendant was a friend of their son.  On October 15, 2010, Macato returned home during the day and found the back door kicked in.  Jewelry, a video game system and many video games, and a laptop computer were missing.  Also gone was Hernandez's Ford F-150 truck, which had been parked in the driveway.  He kept the keys on a nightstand.

A neighbor saw defendant driving Hernandez's pickup and later identified him to the police.

Steve Herrera lived on Marengo Avenue in Stockton.  He was watching television that day when he saw Hernandez's truck parked on the wrong side of the street.  Twice, a man got out, grabbed what looked like a backpack and went to the bushes.  Herrera heard yelling and went outside.  He saw two or three Black teens chasing the man from the truck (defendant).  When they caught up to defendant, he said, " 'you're ruining our lives.' "[6]  Defendant was on the ground, it looked to Herrera like those who had chased him were hitting him.

When Herrera arrived at the scene, an older man was there.  Herrera recognized this man because that man's girlfriend had rented the house next to Herrera's.  The man

---

[6]  A police officer testified that Herrera told him the man said, " 'You're ruining my life.' "

4

said, " 'this is my son, these are all his cousins. I've got to get them out of here before the police show up.' " Herrera returned home and called 911. He moved the backpacks to another location.

*Defendant Taken to the Police*

Defendant was a 16-year-old runaway and had been gone from his father's house for 30 days. After the police found B.R.'s jewelry at the pawn shop, they arrested Clinton and Leon for receiving stolen property. The police began to look for defendant. Meanwhile, defendant had called his father (Rigmaden Sr.) who told him the police were looking for him. Rigmaden Sr. had learned from Leon's girlfriend about the burglary and rape. Defendant called his father while the police were there. Defendant, his father, and Detective Heidi Heim had a three-way conversation during which defendant admitted he was in B.R.'s home, but denied raping her. He said he was there with another man and left once he realized B.R. was home. When the police asked defendant to come talk to them, he hung up.

Rigmaden Sr. got a call on October 15 from his sister that defendant had been spotted. He rushed to the scene, where his nephews were threatening and scuffling with defendant. Defendant tried to run but fell. Rigmaden Sr. put defendant in the car and took him downtown to the police. He took his son because he did not want the police to kill defendant. The Stockton police had killed one of his nephews.

*Defendant Confesses*

Detectives Larry Lane and Brian Fry interviewed defendant. Lane asked defendant why they were there and defendant responded, "Cause um . . . we broke out me and this other fellow robbed some old lady and then the old lady got raped. I guess. Something like that they were telling me. And then um I guess other people jewelry to go pawn [*sic*] and then yeah."

Originally, defendant claimed another man (named Bud) asked defendant if he would like to join him in a "lick" or robbery. Defendant was in the house when B.R.

5

walked in from the bathroom; he got scared and left. Eventually, defendant admitted there was no Bud, only he was in the house. He hit B.R. from behind and she stumbled onto the coffee table. He penetrated her vagina while she was on her stomach on the bed. He also penetrated her anally for a shorter time. Defendant also admitted taking the pickup truck and other items from Hernandez and Macato.

Defendant wrote a letter of apology to B.R. "Mrs. Betty, I am very sorry for the mistake that I have done to you and your house, and I would like to thank you for talking to me and telling me that I was a good kid and for not saying anything bad about me. . . . I'm also sorry for the hitting, pushing, and stealing that I did at your house, and I hope that the rest of your days go by peacefully and pain free. Sincerely, Shaquille."

*Forensic Evidence*

A forensic exam was performed on B.R.'s sexual assault kit. One rectal swab gave a positive on the presumptive test for seminal fluid, but no sperm or seminal fluid was identified. A criminalist explained that the presumptive test is very sensitive and the positive could have been from the victim. No sperm was found on the bedspread, towel, or panties. These results were inconclusive as to whether penetration had occurred.

DNA testing was performed on the bedspread and a towel. The only profile identified matched B.R. B.R. was a major contributor to the stain on the bedspread. There were two minor contributors, but defendant, Clinton, and Leon were all excluded as contributors.

*The Defense*

The defense presented evidence that a month earlier a Black male, not matching defendant's description, had been trespassing at the retirement community. A psychology professor testified as to the problems with eyewitness identification.

6

# DISCUSSION

## I

### *Admission of Defendant's Statements to Police*

Defendant contends it was error to admit his statements to the police. First, he contends he was not properly advised of his *Miranda* rights and did not waive them. Second, he contends his statements were not voluntary. Third, he contends the admission was prejudicial because it is doubtful he would have been convicted without his confession.

A. *Defendant's Statements*

A video tape of defendant's interview at the police station begins at 4:02 p.m. Rigmaden Sr. talks about children and how he had to raise money to bury his nephew. He says defendant ran away and he has to follow up with CPS because defendant's sister tells defendant to say his father beats him when he gets in trouble. Various police officers come in and out of the interview room, including Detectives Heim and Roseann Clark. Defendant is disengaged and keeps him head down. Heim tells him to "look at your dad" and "look at us."

Rigmaden Sr. tells the police his son is "going to tell you everything" and he is looking for the other man involved. To this Heim says, "Ok. How about deputizing you?" Rigmaden Sr. tells his son to take this seriously. "And the reality is this you'll find yourself sitting between some steel and concrete and you possibly could be faced with a lot of time if you don't cooperate." Clark explains what is going to happen and tells defendant this is his chance to tell his side of the story. She explains that they have heard various things and, wanting to be respectful to him, are now going to hear his side. She tells him, "It's time to go stand up for yourself and tell us what's going on. Ok?" Rigmaden Sr. says he has to leave. He tells defendant to "be straight up" with the police and that he "really can't get you a lawyer like just yet." Clark comments on how

Rigmaden Sr. has been "good help" and "bending over backwards" to bring defendant in because he does not want to see defendant hurt.

His father leaves and defendant says he "messed up" his neck. Defendant and the unidentified officer laugh as defendant describes being thrown in the car by his father and hitting his head. Defendant says, "I'm not running."

Rigmaden Sr. returns and asks defendant about the spider tattoo he described on the other man's neck. Rigmaden Sr. tells defendant he does not buy his story about walking by and meeting the other man. Rigmaden Sr. tells defendant, "If that's your story I'm going to see if we can afford a lawyer. . . . Because they're not going to buy it. And cause it don't make sense to me. I'm here to help you if ah, if that's the truth you might be in some trouble because if they can't find somebody else that you say did this, ah, because you was there. You might as well had just you might as well had did what happened to that lady because."

Clark suggests a CVSA (computerized voice stress analyzer) test--already taken by Clinton and Leon--and Rigmaden Sr. agrees to authorize it. He says he is going to his mother's, "I don't know hopefully we can get a lawyer later." Clark then brings defendant some pizza and water and leaves him alone. Defendant eats the entire pizza.

About a half hour later, Detectives Lane and Fry enter. Lane reads defendant a *Miranda* advisement and asks if he understands. Defendant says, "yeah." Defendant tells the detectives how he met Bud outside B.R.'s house and Bud asked if he wanted to do a lick with him and defendant thought, "shit it don't matter." They were in the house four or five minutes when the old lady walked out of the bathroom. Defendant got scared and left. The detectives question defendant about certain details and defendant describes Bud and his spider tattoo.

Defendant recounts calling his cousins (Clinton and Leon) about pawning the jewelry. He and Leon always split what they have, but defendant never saw any money from this transaction. Defendant could not reach Clinton so he called his father who told

8

him Clinton and Leon were "getting interrogated at the police station." His father told him they got $600 for the jewelry. His father told defendant he was wanted for the rape and "I was like what the fuck!" He was going to come in but after talking to Heim on the phone he was not sure. Defendant said the only reason to turn himself in was his grandma to whom he was "hella close." Fry questions defendant about how his father knew it was an 87-year-old woman who was raped.

Defendant again tells his story and Fry asks is there is anything he is leaving out. Fry tells him, "My partner and I [¶] . . . [¶] Are giving you this one chance ok. This one chance to, for to do a bunch of stuff actually. Um. To show some remorse for breaking into this lady's house. Ok. To show that [you] can be a good person, ah to prove something to your family. Like you brought yourself in today. Ok. You didn't say screw it I'm leaving town. I'm running from this they ain't never going to catch me. You've shown some honesty. You corrected yourself and apologized." Fry asks defendant if he took jewelry from anywhere else other than the bedroom and mentions the rings in the living room by the chair that Leon pawned. Defendant said when the woman went into the bathroom, he went to the red La-Z-Boy in the living room and took two rings; he also took some eye glasses in a Gucci case.

Fry tells defendant he and his partner are trying to help him and are treating him with respect. Defendant describes B.R. and what she was wearing. He describes her as older than his grandma. Fry tells him B.R. has a keen eye for detail and memorizes things and she can describe what she saw. "So here's where, when twelve people, which is a jury[,] are sitting on a stand and they're hearing the story I want them to hear someone who's remorseful. Someone who is sorry. Someone who wishes they can take it back if they could. I do not want them to hear a stone cold, break into your house, do whatever I want because I don't care about anyone type of person. I want someone who your grandmother would be proud of. Ok. So I need you to really think long and hard about your story and go ahead and tell it to us again. You have the weight of the world

9

on your shoulders right now. Look at me real quick. You have the weight of the world on your shoulders right now. You're seventeen years old." Defendant corrects him, telling Fry that he is 16. Fry continues, "Barely legal enough to drive. Ok. You have your whole life ahead of you if you want that. Look at me. If you want that. Your whole life ahead of you. Ok. Don't make this a dead end. We have done our homework. We have talked to that lady so much. Ok. We have shown her so many pictures. I need you to think about your future and tell us what happened. You don't need to shake your head like that."

Defendant tells them that the way he described coming in the house and about the house was true. As Fry tells defendant repeatedly that he is a good person, defendant says, "Except for one person it's not true. [¶] . . . [¶] There was no Bud." Defendant begins to cry and says he saw the open door. "So I went in and everything else I told was the truth." Fry asks him to walk him through it. "Don't listen to the part of you that's saying don't say a word. Cause we already know the truth. I want to give you this chance to, with the tears that are coming down your face I see that you're remorseful. Do this for your grandma. You said you came down here for your grandma. So do this for her."

Defendant then admits he hit B.R. She stumbled into the coffee table. He pushed her to the bedroom; she was screaming. He took off her clothes and raped her. He told Fry he was remorseful. He agreed things got out of hand; "That's why I stopped and left." He said the towel over his face was his shirt.

They talk about returning B.R.'s property to her. Defendant then talks about the truck, the backpacks, and all the video games he took from another house.

B. *Hearing on Defendant's Statements*

Before the first trial, defendant moved for a hearing on *Miranda* and due process pending the trial court's ruling on the admissibility of his confession. Defendant argued

10

his father acted as an agent of law enforcement in bringing defendant to the police department for the interrogation.

At the hearing, Sergeant Michael Reynosa testified he met with defendant's father and detailed the efforts to locate defendant. Rigmaden Sr. took him to different houses in an unsuccessful effort to find defendant. The afternoon of October 15, Reynosa received a call from detectives about defendant's whereabouts. He learned Rigmaden Sr. was bringing his son to the station. Reynosa followed the car containing the father and son, and later activated his siren and escorted the car. Reynosa ordered there be no felony car stop (with guns drawn).

Lane testified he read defendant the *Miranda* warnings from a department-issued card. He interviewed defendant from 5:31 p.m. until 7:06 p.m., took a break, and continued until 7:40 p.m. Rigmaden Sr. was not deputized; Lane claimed the reference to deputizing him was a joke. Rigmaden Sr. was not an agent or an informant. Defendant never requested his father or a lawyer during the interview; he never said he needed medical attention.

The defense argued defendant's statement was involuntary. The conduct of his father was important and the police knew defendant was runaway. The police promised defendant help and offered him a " 'special chance,' " all aimed at securing defendant's confession.

The trial court found Rigmaden Sr.'s actions were the natural reactions of a parent who did not want his son hurt, and that Rigmaden Sr. was not an agent of the police. Defendant's statement was voluntary; there were no offers of leniency, and he was properly *Mirandized*. The court concluded defendant knowingly and intelligently made the statements.

At the second trial, the parties stipulated to use the prior record on the *Miranda* issue. The trial court ruled its prior rulings carried over to the new trial.

11

C.  *Advisement and Waiver of* Miranda *Rights*

The People contend that defendant has forfeited any challenge to the advisement and waiver because he did not raise the issue before.  (See *People v. Linton* (2013) 56 Cal.4th 1146, 1170 [failure to assert invalidity of *Miranda* waiver below forfeits issue on appeal].)  Defendant contends any failure to preserve the issue for appeal was ineffective assistance of counsel.  The People further contend the claim lacks merit, and we agree.

*Miranda* requires that a subject taken into custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  (*Miranda v. Arizona*, *supra,* 384 U.S. at p. 479 [16 L.Ed.2d at p. 726].)  Detective Lane told defendant:  "You have the right to remain silent.  Anything you say may be used against you in a court of law.  You have the right to talk to a lawyer and have him or her present with you while you're being questioned.  If you can't afford to hire a lawyer, one will be appointed to represent you before questioning if you wish.  You understand these rights?"  Defendant was properly advised of his rights.

"[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda rights*, waives the right to remain silent by making an uncoerced statement to the police."  (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 388-889 [176 L.Ed.2d 1098, 1115].)  "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation].  When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' [Citations.]"  (*People v. Nelson* (2012) 53 Cal.4th 367, 375.)

12

"Ultimately, the question becomes whether the *Miranda* waiver is shown by a preponderance of the evidence to be voluntary, knowing and intelligent under the totality of the circumstances surrounding the interrogation. [Citations.] The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' [Citation.]" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

Defendant argues he was in custody for an hour before he was given the warnings and by that time his father had made an agreement with the police that defendant would talk. Defendant claims the police had adopted Rigmaden Sr.'s statements to him, warning that he must talk to the police; he would face a lengthy sentence if he did not cooperate; they could not afford an attorney; and he would take a lie detector test. He faults the detectives for waiting until his father left the room before giving the *Miranda* advisement and never telling him that it was *his* choice, not his father's, whether to talk to them. He contends the perfunctory advisement, treated as a mere technicality, did not cure these problems.

Defendant relies on *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643], where the police waited until after the defendant confessed to give *Miranda* advisements. Nothing similar happened here. Before the advisement, defendant was not questioned about the crimes and made no incriminating statements. The delay in reading defendant his rights was not used to coerce him, nor did it have the effect of doing so. A good deal of the time he was in custody before the interrogation, defendant was eating pizza. Any pressure defendant felt to talk to the police came from his father, not law enforcement. Defendant's arguments to the contrary fail.

Defendant has abandoned his earlier argument that his father was an agent of the police. Instead, he contends the police adopted Rigmaden Sr.'s statements--about the

13

need to talk and the inability to hire a lawyer--because they did not correct him and Heim and Clark suggested defendant *had* to talk to them.  Defendant, however, cites no authority to support his suggestion that the police have an obligation to correct what a suspect believes or is told by others when the police give proper advisements.  (See *People v. Smith* (2007) 40 Cal.4th 483, 503-504 [*Miranda* waiver valid despite failure to correct defendant's belief as to timing of appointment of counsel].)  Significantly, defendant was given the advisements by a different set of detectives than those present when his father was there.  Neither Lane nor Fry made any mention of Rigmaden Sr. or what he wanted or expected of defendant, or of any agreement that defendant would talk. The advisements clearly told defendant he had the right to remain silent, curing any contrary impression left by Heim or Clark.  Defendant objects the advisement was given after his father left, but "courts have declined to impose a requirement that police advise minors of a right to speak with parents or to have a parent present during questioning. [Citations.]" (*In re John S.* (1988) 199 Cal.App.3d 441, 445-446.)  While Rigmaden Sr. certainly wanted his son to cooperate and talk with the police, and the police believed defendant would do so, the delay between Rigmaden Sr. leaving and the interrogation beginning, if anything, *lessened* the effect of the father's influence.  It gave defendant an opportunity to assert his rights without the involvement of his father, if he chose to do so. He did not.

Defendant contends the *Miranda* advisement was ineffective because Lane treated it as a mere technicality.  Lane told defendant, "I got to read this to you.  Um just cause you're in here, ok?"  In *People v. Musselwhite* (1998) 17 Cal.4th 1216, at page 1237, our Supreme Court recognized that "evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision--by 'playing down,' for example, or minimizing their legal significance--may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent."  There, before the officer read the defendant his rights, he

14

commented:  "Well, we don't know what you know and what you don't know and so, what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it.  Is that alright with you?"  (*Ibid.*)  The court found no misrepresentation of the importance of *Miranda* rights based on the brief and accurate nature of the statement, the fact officers never described the *Miranda* warning as a " 'technicality,' " defendant's prior police contacts, and that he was likely aware he was a suspect in a murder investigation.  (*Id.* at p. 1238.)  The same is true here.  Lane never described the advisement as a technicality; defendant had prior contacts with police and the justice system and he clearly understood that he was in custody because he was suspected of burglary and rape.

Defendant has failed to show he was not properly advised of his *Miranda* rights or that he did not validly waive them.

D.  *Voluntariness of Statements*

"A criminal conviction may not be founded upon an involuntary confession. [Citation.]  'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.  [Citations.]  In determining whether a confession was voluntary, " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' "  [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.]  " 'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " [Citation.]'  [Citation.]"  (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

In considering the totality of circumstances to determine the question of voluntariness, relevant factors include "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation];

15

and mental health." (*Withrow v. Williams* (1993) 507 U.S. 680, 693 [123 L.Ed.2d 407, 420].)

Defendant contends his statements were not voluntary because he was young and immature, his neck was hurt, he was a victim of physical abuse, there was an hour delay before he received the *Miranda* advisement, and there was police coercion. The record does not support defendant's claim.

Defendant was 16 and had not finished his freshman year of high school. Nothing indicates, however, that he did not understand his circumstances; he knew why he was at the police station and the significance of it. He had already had a lengthy discussion with Detective Heim. He explained why he was willing to be there, "the only reason what made me want to turn myself in is because of my grandma."

While defendant said he had "messed up" his neck, he never complained of pain or asked for medical attention. Indeed, he laughed with the officer about the circumstances. He did not mention his neck to Lane and Fry. Rigmaden Sr. indicated some involvement with CPS, claiming defendant's sister told defendant to claim he was beaten when he was in trouble. But there was no evidence that defendant had been physically abused. As discussed *ante,* the delay before the interrogation began did not show coercion.

"[O]nly those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable" are prohibited. (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Nothing in the record supports defendant's assertion that the "police deliberately obtained [his] agreement to speak with them" before advising him of his rights. Defendant contends Fry made an implied promise of leniency when he told defendant he had "one chance . . . to do a bunch of stuff," to show remorse and that he was a good person, and to prove something to his family. But Fry only pointed out the benefit "which flows naturally from a truthful and honest course of conduct," which is not improper. (*People v. Hill* (1967) 66 Cal.2d 536,

16

549.)  "And there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials." (*People v. Williams, supra,* 49 Cal.4th at p. 444.)

Defendant also contends that Fry was coercive because he (1) suggested defendant's admission that he went into the living room (where B.R.'s rings were) would divert suspicion from his cousin Leon; (2) tricked him into believing the police were not adversarial; and (3) lied by suggesting that B.R.'s description of the assailant matched defendant.  We disagree.  Defendant's confession was not induced by threats or implied promises of leniency.  (See *People v. Neal* (2003) 31 Cal.4th 63, 79.)  Rather, Fry effectively appealed to defendant's conscience and his desire to tell the truth.  "The compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also brings great psychological relief." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 583-584.)  When he admitted his crimes, particularly the rape, defendant was crying; he was remorseful and embarrassed by what he had done.  (Aug. RT 72, 74, 76)  "I felt hella bad.  [¶] . . . [¶]  I was just like fuck it I can't do this shit right here.  [¶] . . . [¶]  But I was not in it for that, fuck that."

At oral argument, defendant relied on the recent case *In re Elias V.* (2015) 237 Cal.App.4th 568, in arguing his confession was coerced.  In *Elias*, the court found a confession of a 13-year-old was not voluntary, based on his youth and lack of sophistication, the dominating and intimidating interrogation, and the lack of any evidence corroborating the juvenile's inculpatory statements.  We find *Elias* thoroughly distinguishable.  Defendant was both older and more sophisticated and the interrogation was much less aggressive and dominating.  Most significantly, here there was ample corroboration for defendant's story; defendant told the police a substantial number of details about the crime that matched the victim's story.

The trial court did not err in finding defendant's statements to the police were voluntary and admitting them at trial.

17

## II

*Instructing Jury that Trial Court Found Defendant's Statements Voluntary*

Defendant contends the trial court erred in telling the jury that it had already found defendant's statements to the police to be voluntary. Although defendant recognizes that the trial court must determine that the statement is voluntary as a preliminary fact before admitting the statement (see Evid. Code, § 402, subd. (b)), he contends disclosing its determination to the jury was error under Evidence Code section 405, subdivision (b)(1), because the issue of voluntariness was inextricably bound up with the issue of reliability, a factual issue for the jury. He further contends disclosing the court's finding on voluntariness affected his substantial rights because it violated his rights to trial by jury, to present a defense, and due process of law. He contends the error requires reversal under any applicable standard of prejudice.

A. *Background*

Defendant objects to statements by the trial court at three different points in the trial: during voir dire,[7] during cross-examination of Detective Lane, and during defense closing argument.

During voir dire, the court discussed with a prospective juror N. his answer to a question regarding whether the existence of a confession might cause him to be biased against defendant. N. indicated "a confession is a confession," and "if he confessed, he confessed." The court asked if N. always believed what someone said, and N. said it depended on the circumstances; "where they have been -- did they keep him up for hours, did they just keep hammering on him, did they offer him a deal to confess?" The court responded, "Okay. Some of those are judicial issues for the Court to decide, but certainly

---

[7] In the original respondent's brief, the People incorrectly claimed the exchange at issue occurred during defendant's first trial. After defendant pointed out the error, the People filed a supplemental respondent's brief and defendant answered.

believability of whether, in fact, he committed the act is something that the jurors can decide, so you don't need to worry about whether the confession itself was voluntary and meets the legal standard, it's whether it was believable and whether, based on all the totality of the evidence, at the point you thought it was true, so it's a different issue."  N. said he was not sure he followed the court's explanation, "To me, if someone confesses that they did something --  [¶] . . . [¶]  that's a confession of guilt."

The court asked if there were circumstances under which N. could find the confession inaccurate or unbelievable.  N. responded that he would consider how it was obtained, if defendant was *Mirandized*, and if his attorney was present.  N. added that usually a confession indicates guilt.  The court excused N. from the panel.

During cross-examination of Detective Lane, counsel asked about references to obtaining a lawyer while defendant was in the interrogation room.  The trial court sustained the People's objection, commenting "we have heard the video at this point."  The court continued, "The issue of believability of what the defendant says, his statements are for the jury.  The voluntariness of the statement and whether that's legally permissible and usable in court is something the court decides beforehand, so it's not anything the jury has to deal with, but whether you believe the statement is something you can reflect on."

In closing argument defense counsel went through defendant's statement to the police at length, arguing "they are setting the stage to get incriminating statements, albeit they are unreliable and untrue."  She argued the *Miranda* advisement was given in a way to minimize the rights.  To the People's objection, defendant counsel responded, "It's for the effect, it's not as to admissibility."  The court stated, "Again, the Court has already ruled on the *Miranda* issue and allowed in the statement, but whether you believe the statement or not is an issue for the jury.  So that's the fine line we are dealing with here."

19

B. *The Law*

"[U]nder Evidence Code sections 402 and 405, the *voluntariness* of a confession is a 'preliminary fact' that a trial judge must determine before the confession may be submitted to the jury. [Citation.]" (*People v. Hoyos* (2007) 41 Cal.4th 872, 897, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 920.) "If a preliminary fact is also a fact in issue in the action: [¶] (1) The jury shall not be informed of the court's determination as to the existence or nonexistence of the preliminary fact." (Evid. Code, § 405, subd. (b), (b)(1).)

As the United States Supreme Court has explained, while the voluntariness of a confession is a legal issue for the trial court, the separate factual question of the confession's reliability is an issue for the jury. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 645] (*Crane*); *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1205-1206.) In *Crane*, the petitioner (a 16-year-old) wanted to testify regarding the physical and psychological environment in which his confession was obtained in order to argue that his confession was not credible. (*Crane, supra,* 476 U.S. at p. 684 [90 L.Ed.2d at p. 641].) The Supreme Court found that "blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (*Id.* at 690 [90 L.Ed.2d at p. 645].) "[S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, . . . and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." (*Id.* at p. 689 [90 L.Ed.2d at p. 644]). The opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion

20

of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' [Citations.]" (*Id*. at pp. 690-691 [90 L.Ed.2d at p. 645].)

C. *Forfeiture*

The People contend defendant forfeited this contention by failing to object to any of the court's remarks. Defendant contends the court's comments were jury instructions and he may challenge them without an objection because they affected his substantial rights. (§ 1259.)

Some of the trial court's statements at issue informed the jury what the law was and described the issues the jurors did and did not have to decide. Because these comments described the law and detailed its application, we consider them to be jury instructions subject to section 1259. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1135 [a jury instruction contains a principle of law applicable to the case].) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Accordingly, we shall consider the merits of defendant's contention.

D. *Analysis*

Relying on a number of out of state cases, defendant contends it was error for the court to tell the jury that it had found defendant's statements to the police were voluntary.[8] He contends that by giving its opinion on a factual issue, the court

---

[8] In *Chumley v. State* (Ga. 2008) 655 S.E.2d 813, at page 816, the court instructed the jury it had ruled defendant waived his *Miranda* rights and his statement was freely and willingly given. That instruction was found to violate a state statute and remand for a new trial was mandatory. (*Ibid*.) In *Kagebein v. State* (Ark. 1973) 496 S.W.2d 435, at page 438, the court reversed due to a violation of *Miranda*. The court addressed other

21

improperly influenced the jury and invaded its province.  The People dismiss defendant's argument, claiming it "borders on the frivolous."  The People assert "the trial court did not 'instruct' the jury that it found appellant's statement to be voluntary," but instead correctly explained the distinction between the court's decision to admit defendant's statements and the jury's decision to decide if they were reliable.

Defendant's claim is far from frivolous.  As pertinent here, the trial court told the jury:  (1)  Some circumstances of taking a confession were "judicial issues for the Court to decide," "so you don't need to worry about whether the confession itself was voluntary and meets the legal standard."  (2)  "The voluntariness of the statement and whether that's legally permissible and usable in court is something the court decides beforehand, so it's not anything the jury has to deal with, but whether you believe the statement is something you can reflect on."  (3)  "Again, the Court has already ruled on the *Miranda* issue and allowed in the statement, but whether you believe the statement or not is an issue for the jury."

We conclude that from these statements a reasonable juror would understand the trial court had already determined defendant's confession was voluntary and therefore admissible.  But the *legal* issue of voluntariness for purposes of ruling on a confession's admission is separate from the *factual* issue of its reliability when considered by the jury after its admission into evidence.  Therefore, we must determine whether the jury could consider voluntariness in making its decision as to the confession's reliability.  In other

---

claims of error that might arise on retrial.  It found it was error for the court to limit cross-examination about the circumstances of obtaining the confession and to tell the jury it had determined the confession was voluntary.  (*Id*. at pp. 440-441.)  In *State v. Walker* (N.C. 1966) 145 S.E.2d 833, at pages 836 through 837, telling the jury that defendant's statements were freely and voluntarily made violated state law.  In *United States v. Bear Killer* (8th Cir. 1976) 534 F.2d 1253, at pages 1258-1259, the court found both statutory demand and fairness requires a court not to disclose its finding of voluntariness.  The court found the error harmless in light of other instructions and because the jury found guilt only as to a lesser charge.  (*Id*. at pp. 1259-1260.)

words, did the confession's voluntariness remain at issue in the case, such that the trial court erred under Evidence Code section 405, subdivision (b)(1) in disclosing its finding to the jury? We conclude the answer is yes.

The United States Supreme Court has noted there may be a relationship between the voluntariness of a confession and its reliability. (*Lego v. Twomey* (1972) 404 U.S. 477, 484 [30 L.Ed.2d 618, 624-625].) A defendant is free "to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness." (*Id*. at p. 486 [30 L.Ed.2d at p. 625].) That the reliability of a confession may depend in part on its voluntariness is a common sense conclusion. It is supported in this very case by the court's discussion with prospective juror N., who cited issues of voluntariness--whether the defendant had been kept up for hours, "hammered," advised of his rights--as circumstances N. would consider in assessing reliability. Because the factual issue of voluntariness remained an issue in the case, the trial court erred under Evidence Code section 405, subdivision (b)(1).

However, that does not end our inquiry. We must next determine whether the trial court, by its error, committed *constitutional* error such that defendant's substantial rights were adversely affected. Defendant has cited no case in which a reviewing court has found constitutional error because the trial court encroached on the jury's factual determination of reliability by revealing its legal determination regarding voluntariness.[9] Under the circumstances present here, we do not see that the court removed a factual issue from the jury's consideration or lessened the People's burden of proof. Defendant

---

[9] In *Dempsey v. State* (Md. 1976) 355 A.2d 455, at page 463, the court found it error to tell the jury that defendant's confession was voluntary. It found the error was not harmless beyond a reasonable doubt. (*Id*. at p. 465.) At that time, Maryland courts applied the same harmless error standard for all errors in criminal cases and did not distinguish between constitutional and other errors. (*Dorsey v. State* (Md. 1976) 350 A.2d 665, 677.)

23

was permitted to put before the jury *all* the circumstances of his interrogation, as required by *Crane*, and to argue his confession was unreliable. In its comments, the trial court *consistently* indicated that the jury was to determine the reliability of the confession--that is, whether the jury believed the confession given all the surrounding circumstances.

In assessing a claim of instructional error, we determine "whether there is a reasonable likelihood the jurors would have understood the instructions in a manner that violated a defendant's rights. [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246.) We find a reasonable juror would not construe the court's comments about the voluntariness of defendant's statements--made solely in the context of their admissibility--to mean either that the jury could not consider circumstances relating to voluntariness in determining reliability or that the jury was bound by the court's finding of voluntariness. Indeed, it is difficult to imagine how a juror would assess the reliability of the confession *without* considering its voluntariness. Rather, a reasonable interpretation of the court's comments was that the jury did not need to make a finding as voluntariness; the jury needed only to decide if defendant's statements were reliable and worthy of belief.

E. *Prejudice*

As we have described, the trial court erred in informing the jury of its finding as to a preliminary fact, in violation of Evidence Code section 405, subdivision (b)(1). Prejudice arising from state law error is assessed under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at page 836, i.e., whether it is reasonably probable the defendant would have obtained a more favorable result in the absence of the error. (See *People v. Sengpadycith* (2001) 26 Cal.4th 316, 320-321.)

Defendant contends the error is prejudicial because it was not made in the first trial and that trial resulted in a hung jury on all charges. That the trial court did not make the challenged statements in the first trial, in which the jury could not reach a decision on punishment, does not establish prejudice. (*People v. McDowell* (2012) 54 Cal.4th 395,

24

441.)  Similarly, in *People v. Saddler* (1979) 24 Cal.3d 671, at page 684, our high court found an instructional error harmless although the prior trial, in which the instruction was not given, resulted in a hung jury.

We agree with defendant that his statements to the police were crucial evidence. Unlike in *Crane*, however, here defendant was able to put on *all* the evidence of the circumstances surrounding his confession.  Moreover, the circumstances in *Crane* raised considerably more questions than exist here as to the reliability of the incriminating statements.  According to police testimony at the suppression hearing in *Crane*, " 'just out of the clear blue sky,' petitioner began to confess to a host of local crimes, including shooting a police officer, robbing a hardware store, and robbing several individuals at a bowling alley.  [Citation.]  Their curiosity understandably aroused, the police transferred petitioner to a juvenile detention center to continue the interrogation.  After initially denying any involvement in the Keg Liquors shooting, petitioner eventually confessed to that crime as well."  (*Crane, supra*, 476 U.S. at p. 684 [90 L.Ed.2d at p. 641].) Additionally, the petitioner testified "that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." (*Id.* at p. 685 [90 L.Ed.2d at p. 641].)  Furthermore, the petitioner's confession was materially inconsistent with known facts.  For example, he told the police the crime was committed during daylight hours and he took money from the cash register, whereas in fact the crime was committed at 10:40 p.m. and no money was missing from the store. (*Id.* at p. 685 [90 L.Ed.2d at pp. 641-642].)

There are no such indicia of unreliability here; rather, the evidence all points to the reliability of defendant's confession.  Because we find overwhelming evidence that defendant's statements were reliable, we find the error was harmless.  As discussed *ante*, there was no evidence that the statements were the product of police coercion.  As

25

discussed *post* in Part IIIA, there was no evidence to support the theory, advanced by defendant in closing argument, that he confessed to "take the fall" for a family member. In confessing to the crimes, defendant provided a considerable number of details about the crime, corroborating B.R.'s testimony. He knew B.R. was wearing red and that she fell on the coffee table when struck. She spoke to her attacker and told him he was a good kid. Defendant knew B.R. had lost an earring during the assault and he helped her find it. He also helped her with ice before leaving. In describing the specifics of the rape, defendant knew B.R. was on her back at first and then on her stomach. He described taking the Gucci sunglasses from the kitchen counter. The sunglasses were later found in the backpack that defendant threw under bushes. Further, defendant's demeanor when he was confessing showed the reliability of his confession. He cried, expressed remorse, and was embarrassed by what he had done.

## III

### *Errors Relating to Leon's Testimony*

Defendant contends the trial court made multiple errors relating to Leon's testimony. First, Leon was allowed to testify that he offered to take a lie detector test. Second, the court improperly restricted argument about Leon's credibility and then compounded that error by making an inappropriate remark during defense argument.

### A. *Offer to Take a Polygraph Test*

Prior to trial, in discussing motions in limine, the court stated everyone agreed that lie detector results were inadmissible. The People argued that an offer to take the test was admissible and both Leon and Clinton made that offer. The People argued the offer went to the issue of credibility. The defense objected under Evidence Code section 352, on the basis of confusion. The trial court ruled the offer was admissible.

Defendant's cousin Leon pawned some of the jewelry that defendant obtained from B.R.'s house. He testified under a grant of immunity. His immunity agreement specifically mentioned the charges of receiving stolen property (§ 496) and being an

26

accessory after the fact (§ 32). Leon testified that defendant provided the jewelry that was pawned. On cross-examination, Leon testified when the police told him the victim had been beaten, he said he did not know about that and started crying.

The defense then asked him if when he and Clinton were put in the same interrogation room, he thought he was going to get a life sentence. Leon at first said he did not remember. Then he testified, "I wasn't even in the car with [Clinton] when he got arrested. [Clinton] got arrested somewhere totally different. I got arrested in front of my house. I didn't see him until one of the officers came in my interrogation and interrupted and asked me was he retarded. That's when I knew he was there. And then afterwards, when I asked him for a DNA and polygraph test, that's when I seen [Clinton], and that's when I talked to [Clinton]. I wasn't in a closed space with him. I am in handcuffs, he is in handcuffs, we are getting a mouth swab, we are about to go downtown." Defendant now claims allowing this testimony was error.

"Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . ." (Evid. Code, § 351.1.) Thus, the trial court erred in ruling that an offer to take a polygraph test was admissible. However, defendant not only failed to object when Leon testified to his offer, but also failed to provide the proper basis for an objection during the pretrial discussion.

"Under Evidence Code section 353, subdivision (a), a reviewing court cannot grant relief on a claim that evidence was erroneously admitted unless a timely objection was made 'and so stated as to make clear the specific ground of the objection or motion.' ' "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." ' [Citation.]" (*People v.*

27

*Hajek and Vo, supra,* 58 Cal.4th at p. 1214.) By failing to comply with the statutory mandate of a timely and specific objection, defendant has forfeited his claim that it was error to admit Leon's testimony about his offer to take a polygraph test.

Anticipating this conclusion, defendant contends his trial counsel was ineffective in failing to cite to Evidence Code section 351.1 in objecting to admission of an offer to take a polygraph test. "In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." ' [Citations.] It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different. [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Defendant contends the error was prejudicial because it improperly bolstered Leon's credibility. He argues Leon was a pivotal witness because he testified to how he and Clinton got B.R.'s jewelry from defendant. If the jury believed Leon, defendant argues, it was more likely to accept defendant's confession as true and not harbor a reasonable doubt that Leon or Clinton, or both, were involved in the burglary and the rape and that defendant was "taking the fall" for someone else.

Defendant has failed to show a reasonable probability of a different outcome if trial counsel had objected based on Evidence Code section 351.1. Because the reference to Leon offering to take a lie detector test came in a rambling answer and was not mentioned again,**10** it is unlikely the jury put much weight on it in assessing Leon's

---

**10** In the early part of the taped interview with defendant, Detective Clark refers to a lie detector or CVSA test and that "we did it on the um other kids." Defendant sought to

28

credibility. Where the evidence against defendant is strong, such brief and isolated improper references are usually found to be harmless. (See *People v. Hovey* (1988) 44 Cal.3d 543, 572 [defendant's failure to testify]; *People v. Dominguez* (1981) 121 Cal.App.3d 481, 501 [remarks about defendant's parole status].) Defendant fully admitted his guilt, and provided a number of specific details about the crime. The theory that defendant's confession was false because he was forced to falsely accept blame for someone else's crimes was entirely speculative and lacked evidentiary support. In closing argument, counsel claimed defendant "has been told to take the fall," but was unable to cite to evidence to back up this claim. Counsel could point only to evidence that defendant said, " 'You're ruining my life' " when taken to the police, and suggest that various family members must have had conversations because Leon and Clinton were released from jail at the same time and Rigmaden Sr. was close to his family and had contact with them.

B. *Argument and Comment about Leon's Immunity Agreement*

During closing argument, the defense argued Leon's lack of memory, unless confronted with written evidence of his prior words, was "a sign of a formidable liar." "[Leon] made it plain and clear that he is testifying so that he doesn't go to jail, and he is not -- and that he is not going to go to jail because he has immunity so long as he testifies as to what the prosecutor purports to be the truth. He is home free."

The prosecutor objected on the basis of facts not in evidence. The trial court sustained the objection and struck the last reference. "Again, you will have a copy of the agreement, I think it's in evidence, and it does require that he tell the truth, so go ahead." The defense continued the prosecution had not proven that Leon and Clinton were not present in B.R.'s house.

---

introduce this portion of the interview under *Crane, supra,* 476 U.S. 683, to show the circumstances surrounding his confession.

Defendant contends the trial court improperly restricted closing argument by sustaining the objection.[11] He contends the court compounded the error by improperly instructing the jury as to the terms of the immunity agreement.[12] Even assuming defendant is correct that the trial court doubly erred, we find no prejudice for the reasons set forth *ante*. Leon was not an important witness as to the fundamental question of defendant's guilt or innocence, and his credibility was not a significant factor in assessing the reliability of defendant's confession.

IV

*Failure to Instruct on Attempted Rape*

Defendant contends the trial court erred in failing to instruct sua sponte on attempted rape. Although both the testimony of B.R. and defendant's statement to police unequivocally and substantially supported the rape conviction, defendant contends the absence of injury or trauma in B.R.'s genital area and the absence of sperm or seminal fluid would support "a reasonable doubt as to whether penetration occurred."[13]

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the

---

[11] The People do not respond to this argument.

[12] We construe the trial court's remark a comment on the evidence, not an instruction because it dealt with a factual matter--the content of the immunity agreement. " 'An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*People v. Wright, supra,* 45 Cal.3d at p. 1135.) A comment may address matters of fact, an instruction may not. (*Id.* at p. 1136.) In general, objections to noninstructional statements or comments by the trial court must be raised at trial or they are forfeited. (*People v. Anderson* (1990) 52 Cal.3d 453, 468.)

[13] Defendant also suggests B.R. had a tendency to exaggerate, citing differences in her testimony from the first and second trials. B.R., however, was consistent in testifying that she had been raped.

evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]  That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"The trial court must instruct on lesser offenses necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citation.]  On the other hand, if there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.)

"Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence." (*People v. Marshall* (1997) 15 Cal.4th 1, 36.)  "The crime of attempted rape has two elements: (1) the specific intent to commit the crime of rape and (2) a direct, although ineffectual, act toward its commission." (*People v. Clark* (2011) 52 Cal.4th 856, 948.) An attempt to commit rape is a necessarily included offense of rape.  (*People v. Ramirez* (1969) 2 Cal.App.3d 345, 353.)

The penetration required for rape "is sexual penetration and not vaginal penetration.  Penetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232, overruled on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.) Thus, to warrant instructions on attempted rape, there must be some evidentiary basis for the jury to find that the defendant attempted but failed to accomplish the slight

31

penetration that constitutes the crime. Here there was no evidence that defendant attempted to rape B.R., but failed to do so.

Defendant focuses on the lack of vaginal injury or pain. But penetration of the vagina is not required for rape. Moreover, the absence of physical findings was explained. The nurse who performed the sexual assault exam testified there can be penetration without trauma; the lack of trauma does not mean there was no assault. The examining physician, called by the defense, testified that in the majority of his sexual assault cases there are no findings. The criminalist testified that if there were no ejaculation, a penis inserted into an area of mucus membranes, such as a vagina, would not *leave* any DNA because those cells would be overwhelmed by the victim's. Defendant said he did not ejaculate; "I couldn't do it."

To find only attempted rape, the jury would have had to not only disregard the testimony of B.R. and defendant's consistent statement, but also to accept each in part and reject each in part for unexplained, indeed unfathomable, reasons. While a jury may choose to disbelieve any or all of the People's evidence, "[a] defendant's right to instructions does not turn on the court's assessment of credibility or the strength of the evidence." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 371.) Where the only evidence of a lesser offense is "an unexplainable rejection of the prosecution's evidence," an instruction on the lesser offense should not be given. (*People v. Kraft, supra,* 23 Cal.4th at p. 1063.)

The trial court did not err in failing to instruct on attempted rape sua sponte.

V

*Cruel or Unusual Punishment*

Defendant was sentenced to 15 years to life for committing forcible rape during a first degree burglary under California's one strike law. (§ 667.61, subd. (d)(4).) He contends his "mandatory adult sentence of 15-years-to-life violates the state and federal proscriptions against cruel and unusual punishment because the law mandates that a

32

juvenile be sentenced to the same sentence as an adult offender committing the same offense, and violates federal due process because it does not permit the sentencing court to consider youth and its attendant circumstances in mitigation, although juveniles are as a class less culpable and less deserving of punishment than adult offenders."

Defendant relies on a series of United States Supreme Court cases that have recognized the lesser culpability of children in the context of the death penalty or life imprisonment without parole: *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1] [8th Amendment prohibits death penalty for minors]; *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] [8th Amendment prohibits sentence of life without parole for minors who do not commit homicide]; and *Miller v. Alabama* (2012) 567 U.S. __ [183 L.Ed.2d 407] [8th Amendment prohibits mandatory life in prison without the possibility of parole for minors]. He contends the principal underlying these cases--that children are different--must apply to *any* sentence, not just the lengthiest and most severe sentences.

In *People v. Caballero* (2012) 55 Cal.4th 262, at page 268, our Supreme Court concluded that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." Here, defendant was sentenced to a total term of 20 years to life and thus will be eligible for parole while still in his 30's. Under controlling law, defendant's sentence is not cruel or unusual.

In *People v. Perez* (2013) 214 Cal.App.4th 49, at page 58 (*Perez*), the court rejected an argument that "the rationale behind that line of cases—basically the diminished culpability of minors resulting from their immaturity—implies that California's one-strike law is unconstitutional as applied to minors because it deprives trial courts of the discretion to take into account what the *Miller* and *Roper* majorities described as the 'what "any parent knows" ' factor." The *Perez* court found the argument unpersuasive because it overstated the scope of the *Roper-Graham-Miller-Caballero* line

of cases, ignoring that the central focus in those cases was that the juvenile offenders had been exposed to the " 'harshest' " sentence available. (*Id.* at p. 59.)

In *Perez*, the court noted this line of cases had not been used by any court "to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole." (*Perez, supra,* 214 Cal.App.4th at p. 57.) That statement is no longer true. In *State v. Lyle* (Iowa 2014) 854 N.W.2d 378 (*Lyle*), the Iowa Supreme Court held a mandatory minimum sentence for juveniles violated the cruel and unusual clause of the Iowa Constitution. The court relied extensively on the *Roper-Graham-Miller* line of cases (*Lyle,* at pp. 385-386, 392-395, 399), and focused on a juvenile's diminished culpability, that juveniles are less susceptible to deterrence, and their greater likelihood for reform. (*Id.* at pp. 398-400.) Defendant urges this court to follow *Lyle*, arguing it is more persuasive than *Perez*.

We are not bound by the decisions of the courts of other states. (*J.C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1027.) Although we may consider such decisions (*People v. Mays* (2009) 174 Cal.App.4th 156, 167), we decline to follow *Lyle* because it was based on circumstances unique to Iowa. First, the decision is based exclusively on the Iowa Constitution. (*Lyle, supra,* 854 N.W.2d at p. 380.) Second, it builds on a line of Iowa cases addressing sentencing of juveniles: *State v. Null* (Iowa 2013) 836 N.W.2d 41 [*Miller* applies to lengthy aggregate sentences]; *State v. Pearson* (Iowa 2013) 836 N.W.2d 88 [failure to consider rehabilitation potential and lessened culpability of juvenile was error]; and *State v. Ragland* (Iowa 2013) 836 N.W.2d 107 [*Miller* applies retroactively]. (*Lyle, supra,* at pp. 381-382.) Third, the court found support for its decision in recent state legislative action. "Our legislature has already started to signal its independent concern with mandatory prison sentences for juveniles. In 2013, it expressed this recognition by amending a sentencing statute to remove mandatory sentencing for juveniles in most cases." (*Id.* at p. 387.)

34

Defendant makes several earnest policy arguments about sentencing juveniles in light of current research on the developing brains of adolescents (neuroscience).  Because prescribing punishments is a legislative function (*People v. Navarro* (1972) 7 Cal.3d 248, 258), those arguments are more properly directed to the Legislature.  (See *Perez, supra,* 214 Cal.App.4th at p. 59 [question of whether judges should have mandatory discretion in sentencing juveniles in all cases should be addressed to the Legislature].)

## DISPOSITION

The judgment is affirmed.


                                                              DUARTE                    , J.



We concur:



          RAYE                    , P. J.



          HOCH                    , J.